McDONALD'S CORPORATION, Plaintiff,

v.

Steven L. NELSON and Tass Enterprises, Inc., Defendants,

State of Iowa, Intervenor,

Iowa Franchisee Association, Intervenor.

HOLIDAY INNS FRANCHISING, INC., and Holiday Inns, Inc., Plaintiffs,

v.

Terry BRANSTAD, John Q. Hammons, and Omaha Hotel, Inc., Defendants,

Iowa Franchisee Association, Intervenor.

Civ. Nos. 4–92–70301, 4–92–70431.

United States District Court, S.D. Iowa, C.D.

May 14, 1993.

Kimberly J. Walker, Walker Giudicessi & Kincaid, Des Moines, IA, Alan H. Silberman, William T. Barker, Robert T. Joseph and Jill A. Thompson, Sonnenschein Nath & Rosenthal, Chicago, IL, for McDonald's of Delaware, Inc., plaintiff.

Mark Hunacek, Iowa Atty. Gen., Gen. Counsel Div., DOT, Ames, IA, for State of Iowa, intervenor and Terry E. Branstad, defendant.

Brent B. Green and Mariclare Thinnes, Duncan Green Brown Langeness & Eckley, Des Moines, IA, for Steven Nelson and Tass Enterprises, Inc., defendants.

Thomas D. Hanson, Hanson Bjork & Russell, Des Moines, IA, and John G. Parker, Paul Hastings Janofsky & Walker, Atlanta, GA, for Iowa Franchisee Ass'n, intervenor.

Edward W. Remsburg, Ahlers Cooney Dorweiler Haynie Smith & Allbee, Des Moines, IA, John G. Parker, Janet L. Kishbaugh and Ronald T. Coleman, Jr., Paul Hastings Janofsky & Walker, Atlanta, GA, for

Holiday Inns Franchising, Inc., plaintiff and Holiday Inns, Inc., plaintiffs.

Barbara A. Hering Antonio Colacino Bradshaw Fowler Proctor & Fairgrave, John J. Gajdel, Watson & Gajdel, Des Moines, IA, and Hugh D. Mauch, Great Bend, KS, for John Q. Hammons and Omaha Hotel, Inc., defendants.

## MEMORANDUM OPINION, RULINGS, ADJUDICATION, AND § 1292(b) CERTIFICATION

VIETOR, District Judge.

Plaintiff McDonald's Corporation ("McDonald's") and plaintiffs Holiday Inns Franchising, Inc. and Holiday Inns, Inc. (jointly referred to as "Holiday Inns") bring separate actions for declaratory judgment seeking determinations that the Iowa Franchise Act, House File 2362 (codified at Iowa Code ch. 523H) ("Act"), violates various provisions of the United States and Iowa constitutions.[1] McDonald's and Holiday Inns each move for partial summary judgment[2] on their claims that the Act violates federal and state Contract Clauses, U.S. Const. art. 1, § 10, cl. 1; Iowa Const. art. 1, § 21.[3] Defendants and intervenors in each case resist plaintiffs' motions. Defendant Terry Branstad in the Holiday Inns case, and intervenor State of Iowa in the McDonald's case, filed cross-motions for partial summary judgment. Plaintiffs resist the cross-motions. The court heard oral arguments, and all the motions are submitted.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

1. Plaintiffs claim, *inter alia,* impairment of contracts, denial of procedural and substantive due process, denial of equal protection, and discrimination against and undue burden on interstate commerce.

2. Although McDonald's calls its motion a motion for summary judgment, it is more accurately called a motion for *partial* summary judgment

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Continental Grain Co. v. Frank Seitzinger Storage, Inc.,* 837 F.2d 836, 838 (8th Cir.1988). The nonmoving party must go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Johnson v. Schopf,* 669 F.Supp. 291, 295 (D.Minn.1987). The quantum of proof that the nonmoving party must produce is not precisely measurable, but it must be "enough evidence so that a reasonable jury could return a verdict for the nonmovant." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986); *Johnson,* 669 F.Supp. at 295–96.

On a motion for summary judgment, the court views all the facts in the light most favorable to the nonmoving party, and gives that party the benefit of all reasonable inferences that can be drawn from the facts. *United States v. City of Columbia, Mo.,* 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990).

## BACKGROUND FACTS

The following facts are undisputed. From 1974 to 1982, McDonald's entered into license agreements with Arch Madden for six McDonald's restaurants in central Iowa. The license agreements run for the following terms: (1) Ankeny, December 1974 to December 1994; (2) S.E. 14th, December 1974

because it is addressed only to the contract clause claims.

3. On October 13, 1992, this court declined to consolidate these two cases, but because of the common legal issues in the motions, the court decided to hear the motions for summary judgment together.

to December 1994; (3) S.W. 9th, April 1979 to April 1999; (4) Altoona, February 1980 to February 2000; (5) Indianola, May 1981 to May 2001; and (6) E. 14th, November 1982 to October 2002. Defendant Steve Nelson acquired the rights to all of the above license agreements in July 1990 and March 1991; each franchise agreement has been assigned to defendant Tass Enterprises, Inc. (Nelson continues to be personally liable for the obligations).

Holiday Inns has two license agreements with defendant Omaha Hotel, Inc. One of the agreements, for a hotel in Davenport, is dated August 26, 1982, and has a termination date of August 8, 1996; the other agreement, dated July 2, 1984, is for a hotel in Council Bluffs, and has a termination date of August 14, 1995. Holiday Inns also has a license agreement with defendant John Q. Hammons for a hotel in Des Moines; that agreement is dated December 30, 1986, and has a termination date of December 29, 2006.

The Iowa Legislature convened the Franchise Regulation Interim Study Committee in 1991 to examine whether franchises in Iowa needed to be regulated, and if so, what that regulation would be. The Study Committee, composed of members of both the House and Senate, met on September 27, 1991, and November 1, 1991. The Committee heard testimony and received reports from franchisors, franchisees, experts, and other interested individuals and entities. In January 1992, the Committee issued its final report containing its recommendations for legislation. After debate and compromise, the final version of the Act was passed on a 90 to 8 vote in the House and a 40 to 5 vote in the Senate. Governor Terry Branstad signed the bill on April 23, 1992. The Act became effective on July 1, 1992.[4]

### INTRODUCTION

In their motions, McDonald's and Holiday Inns challenge, as violative of federal and state Contract Clauses, several sections of the Act in particular: Section 2, which makes the Act applicable to existing franchises operating in the state of Iowa; Section 5, governing transfers of franchises; Section 6, providing guidelines for new franchise encroachment on existing franchises; Section 7, regarding termination (only Holiday Inns specifically argues this section); and Section 8, on nonrenewal of franchises.

First, the court will set out the challenged statutory provisions, the contractual provisions alleged to be impaired, and plaintiffs' contentions as to the nature of the impairment. Next, the court will address two preliminary legal issues, ripeness and the Eleventh Amendment. The final section of the opinion will examine the issues presented under the Contract Clause.

### STATUTORY AND CONTRACTUAL PROVISIONS

### I. *Transfer of Franchise*

#### A. **Section 5 of the Act**

Section 5 provides that a franchisee may transfer the franchise if the transferee satisfies the "reasonable current qualifications" (qualifications based upon legitimate business reasons) of the franchisor for new franchisees. If the proposed transferee does not meet the franchisor's qualifications, the franchisor may refuse to permit the transfer, as long as the franchisor's refusal "is not arbitrary or capricious when compared to the actions of the franchisor in other similar circumstances." Iowa Code § 523H.5(1). Holiday Inns challenges subsections (1), (4), (5), and (13)(d), (e), and (f); McDonald's challenges subsections (4) and (13)(d), (f), and (g).

Subsection (4) states that a "franchisor shall not withhold consent to a franchisee making a public offering of the franchisee's securities without good cause, provided the franchisee or the owners of the franchise retain control of more than fifty percent of the voting power in the franchise."

Subsection (5) states that a "franchisee may transfer the franchisee's interest in the franchise, for the unexpired term of the franchise agreement, and a franchisor shall not require the franchisee or the transferee to enter into a new or different franchise agreement as a condition of the transfer."

---

4. Additional undisputed facts are discussed in other sections of the opinion.

Subsection (13) provides that certain occurrences shall not be considered transfers requiring the consent of the franchisor. These occurrences include a "transfer within an existing ownership group of a franchise" (13(d)); a "transfer of less than a controlling interest in the franchise to the franchisee's spouse or child or children" (13(e)); and a "transfer of less than a controlling interest in the franchise of an employee stock ownership plan, or employee incentive plan" (13(f)); all with the proviso that more than fifty percent of the entire franchise is held by those who meet the franchisor's reasonable current qualifications for franchisees. Under each of these subsections, if less than fifty percent of the franchise would be owned by persons who meet the franchisor's qualifications, "the franchisor may refuse to authorize the transfer," as long as the enforcement of the qualifications is not "arbitrary or capricious when compared to actions of the franchisor in other similar circumstances." The occurrence in 13(g), which is also an occurrence not considered a transfer requiring franchisor consent, is a

> grant or retention of a security interest in the franchised business or its assets, or an ownership interest in the franchisee, provided the security agreement establishes an obligation on the part of the secured party enforceable by the franchisor to give the franchisor notice of the secured party's intent to foreclose on the collateral simultaneously with notice to the franchisee, and a reasonable opportunity to redeem the interests of the secured party and recover the secured party's interest in the franchise or franchised business by paying the secured obligation.

## B. McDonald's

Paragraph 15 of the McDonald's license agreement states that the licensee cannot "assign[ ] or otherwise transfer[ ] in whole or in part" its interest in the license without the prior consent of the licensor. Subparagraphs (a) and (b) provide for assignment to family members in the case of death or permanent incapacity of the licensee, and assignment to wholly-owned corporations of the licensee. Subparagraph (c) provides the licensor with a first option to purchase the license after notice of licensee's intent to sell or transfer the license. Subparagraph (d) states that in addition to the assignments in subparagraphs (a) and (b), the licensee "shall not sell, transfer or assign this License to any person or persons without Licensor's prior written consent. Such consent shall not be arbitrarily withheld." Under subparagraph (d), the licensor considers several criteria in determining whether to grant consent, including work experience and aptitude, financial background, character, ability to devote full time to the restaurant, residence in locality of restaurant, equity interest in restaurant, conflicting interests, and other criteria and conditions then considered for applications for new licenses.

McDonald's argues that because the Act provides franchisees with a variety of transfer rights that pre-existing agreements, like those with defendants, do not allow, the Act is invalid as to pre-existing license agreements.

## C. Holiday Inns

Section 12 of the Holiday Inns license agreement sets out many restrictions on transfer of the license. It states that any transfer "not specifically authorized pursuant to this section will be void and will also be a breach of this agreement. The License may not be the subject of a security interest, lien, levy, attachment or execution." If the licensee wants to transfer the license, the "proposed transferee will, with Licensee's consent, apply for a new license agreement to replace the License for the unexpired term. Licensor will process the application in good faith and in accordance with procedures and criteria * * * then being applied by Licensor in issuing new licenses * * *."

Section 12 of the agreement also contains provisions allowing transfer of equity interests with the licensor's consent with certain restrictions.

Holiday Inns argues that Section 5 of the Act directly conflicts with its requirement that transferees enter into new license agreements upon transfer, in part because the new agreements often require the transferee to perform reasonable quality upgrades. It

also contends that the Act substantially restricts Holiday Inns' rights under existing agreements to control transfers and to select the best qualified individuals or entities as franchisees.

## II. *Encroachment*

### A. Section 6 of the Act

Section 6 states that notwithstanding the terms of an agreement or franchise,

> if a franchisor seeks to establish a new outlet, * * * within an unreasonable proximity of an existing franchisee, the existing franchisee, at the option of the franchisor, shall have either a right of first refusal with respect to the proposed new outlet, * * * or a right to compensation for market share diverted by the new outlet.

§ 523H.6(1). As applied to a food establishment or food service establishment franchisor, "unreasonable proximity" includes but is not limited to "the shortest distance as measured by the following methods": (a) a "three-mile radius, using a straight line measurement, from the center of an already existing franchise"; (b) a "circular radius, using a straight line measurement, from an existing franchise business which comprises a population of thirty thousand or greater."

Section 6(2) provides for a procedure for right of first refusal. First the parties "seek to establish a mutually agreeable price and terms." If they cannot reach agreement, each party appoints an independent appraiser. If the independent appraisers cannot agree, they name a third appraiser to determine the price and terms. The third appraiser's decision is final and binding, subject to judicial review under Iowa Code chapter 679A. The compensation for the diverted market share is determined by the same process. § 6(3).

### B. McDonald's

Paragraph 2(a)(i) of the McDonald's agreement states that McDonald's grants a license to the licensee "to adopt and use the McDonald's System" in the restaurant at only the location specified in the agreement. The licensee acknowledges in paragraph 28(e) that the license establishes a restaurant at the location specified only, and "no 'exclusive,' 'protected' or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred." McDonald's argues that its experience shows that the absence of territorial or exclusive rights for the franchisee serves as an incentive to do more than bare-minimum compliance with the agreement and to avoid material breaches of the agreement.

Also, McDonald's has been planning to develop a new restaurant on Fleur Drive in Des Moines—a site that is within a three-mile radius of Nelson's existing S.W. 9th franchise location. Contrary to existing license agreements, under which McDonald's would be able to determine according to its own practices and policies who should operate the new franchise, the Act provides certain rights to existing franchisees in this situation. Therefore, McDonald's argues, the Act substantially impairs the license agreements.

### C. Holiday Inns

Section 1 of the Holiday Inns agreement states that the license is nonexclusive, and "applies to the specified location and no other." It also provides that the agreement "does not limit Licensor's right to use or license the System or to engage in or license any business activity at any other location."

Holiday Inns argues that Section 6 of the Act imposes vague and undue restrictions on the establishment of new franchises or company-owned locations, undermining the concept of a nonexclusive license which is fundamental to its license agreements. It further asserts that the section apparently would apply to establishing franchises of different brands by the same franchisor (e.g., "Holiday Inn" hotel and a "Holiday Inn Crowne Plaza"), thereby preventing it from serving different market segments of the consuming public in a given area.

## III. *Termination*

### A. Section 7 of the Act

Section 7(1) states that "a franchisor shall not terminate a franchise prior to the expiration of its term except for good cause," i.e. "cause based upon a legitimate business rea-

son." Good cause includes a franchisee's failure to "comply with any material lawful requirement of the franchise agreement, provided that the termination by the franchisor is not arbitrary or capricious when compared to the actions of the franchisor in other similar circumstances."

Prior to good cause termination, the franchisor must provide the franchisee with "written notice stating the basis for the proposed termination." § 7(2). After service of the notice, the franchisee "shall have a reasonable period of time to cure the default," no less than 30 days or more than 90 days. *Id.*

Section 7(3) provides a list of situations in which "a franchisor may terminate a franchisee upon written notice and without an opportunity to cure," including: bankruptcy or insolvency of the franchisee or franchise business, voluntary abandonment by the franchisee, mutual agreement by the franchisor and franchisee to terminate, knowing material misrepresentation by the franchisee, the franchisee's repeated failure to comply with the same material provision of the franchise agreement, lawful seizure or foreclosure by the government, conviction of felony or other criminal misconduct that materially affects the franchise, and operation of the franchise in a manner imminently endangering the public health and safety.

### B. Holiday Inns

Section 14 of the Holiday Inns agreement provides that the license will terminate without notice on a specified date (usually for a 20–year term), subject to earlier termination in certain stated situations. Section 14 also provides for liquidated damages for premature termination.

Section 14(b) states that the licensor may terminate with notice if: "(i) the notice is mailed at least 30 days (or longer, if required by law) in advance of the termination date, (ii) the notice reasonably identifies one or more breaches of the Licensee's obligations, and (iii) the breach(es) is/are not fully remedied within the time period specified in the notice." If the notice is the second notice in 12 months about a certain violation for which the default was remedied the first time, the

cure period will "if and to the extent permitted by law" be 10 days instead of 30.

The licensor can immediately (or at the earliest time permitted by applicable law) terminate the licensee upon notice for the following reasons: licensee's insolvency or bankruptcy, licensee's loss of possession of the hotel, licensee's pursuit of a legal contest to the licensor's ownership of the system, a breach of Section 12 (transfer) occurs, dissolution or liquidation proceedings on a corporate or partnership licensee (except for death of a partner), or "Licensee is, or is discovered to have been, convicted of a felony (or any other offense if it is likely to adversely reflect upon or affect the Hotel, the System or Licensor in any way)."

Holiday Inns argues that the Act's vague requirement of "good cause" should not replace its own well-defined and explicit provisions in its existing agreements. It also asserts that the Act would prohibit it from immediately terminating a franchisee in cases of egregious misconduct.

### IV. *Nonrenewal of a Franchise*

#### A. Section 8 of the Act

A franchisor cannot refuse to renew a franchise unless: (1) the franchisor notifies the franchisee of its intent not to renew "at least six months prior to the expiration date of the franchise agreement"; *and* (2) good cause exists as defined in section 7 (and the refusal not to renew is not arbitrary or capricious compared to franchisor actions in similar circumstances), *or* the franchisor and franchisee agree not to renew the franchise (provided that the franchisor agrees not to enforce any covenant not to compete with the franchisor or its franchisees when the franchise expires), *or* the "franchisor completely withdraws from directly or indirectly distributing its products or services in the geographic market served by the franchisee" (provided that the franchisor agrees not to enforce any covenant not to compete with the franchisor or its franchisees).

#### B. McDonald's

All of the McDonald's license agreements at issue are for specific 20–year terms. The

licensee acknowledges in paragraph 28(a) that the license is issued for the term stated "with no promise or representation as to the renewal of this License or the grant of a new License." McDonald's follows its own procedure for determining whether to re-write a license agreement, which it has found serves as an incentive to "maximize franchisee performance and dedication." McDonald's Brief, p. 25. McDonald's argues that the Act, because it restricts the right of the franchisor to refuse to renew a franchise, contravenes the parties' existing agreements.

### C. Holiday Inns

The Holiday Inns license agreements are for stated terms, and terminate without notice on the specified termination date. Section 15 of the agreements governs renewals. The licensee can apply for a "commitment to renew the License" during a certain year of the term (the 15th year for 20–year terms). The licensor promises to process the application in good faith and in accordance with procedures and criteria applicable to new license applications at the time. If the licensor approves the application, the parties sign two agreements: "A new license agreement covering the unexpired License Term under this agreement, and a commitment agreement to renew the License Term, upon expiration, for a specified time (up to 10 years) if Licensee fulfills specified upgrading and other requirements within a specified time."

Holiday Inns argues that the Act substantially impairs its agreements by effectively requiring Holiday Inns to grant a franchise of perpetual duration at the option of the franchisee, even though the franchisee paid only for a specified term. Holiday Inns also argues that the Section 8 of the Act disserves the public by preventing Holiday Inns from replacing marginal hotel operators at the end of a term, and from responding to changing market conditions by replacing inappropriate hotel locations.

### RIPENESS

Certain defendants and intervenors argue that the issues in these cases, at least as applied to plaintiffs' specific license agree-

ments, are not ripe for judicial determination. To fit within the constitutional limit on federal court jurisdiction to "cases and controversies," U.S. Const. art. III, § 2, "the controversy must be definite and concrete and not of a hypothetical or abstract character." *Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO v. Gillette Co.,* 905 F.2d 1176, 1177 (8th Cir.1990); *see also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). "The ripeness doctrine is invoked to determine whether a dispute has yet matured to a point that warrants decision. The determination is rested both on Article III concepts and on discretionary reasons of policy." *Automotive, Petroleum & Allied Indus. Employees Union, Local 618 v. Gelco Corp.,* 758 F.2d 1272, 1275 (8th Cir.1985) (citation omitted). The "question of ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); *see also Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977); *Gelco Corp.,* 758 F.2d at 1275.

■ In determining whether the issues are fit for consideration, courts look at numerous factors, including the adverseness of the parties, whether the legal issues would be affected by further factual development, judicial efficiency, finality, and the likelihood that the asserted injury or anticipated events will occur. *See Allstate Ins. Co. v. Wayne County,* 760 F.2d 689, 696 (6th Cir.1985) (citing various cases).

■ Here, the defendants and intervenors are sufficiently adverse to plaintiffs; the parties are contesting vigorously the issue of the constitutionality of the Act as applied to existing license agreements between plaintiffs and defendants. Because plaintiffs request a declaration that the Act's provisions in and of themselves conflict with their rights under

their license agreements, further factual development is unnecessary.

The anticipated events are likely to occur. Some of the license agreements are approaching their termination dates; this certainly implicates the termination and nonrenewal provisions of the Act. The encroachment provisions of the Act affect the parties to the agreements not only when the final steps are taken to acquire land for a new franchise within an "unreasonable proximity" to an existing franchisee, but also at the planning and development stages when a decision has to be made whether and where to open a new franchise. The transfer provisions change the franchisor consent requirements and the conditions under which some transfers can occur. Although the parties could await a situation where a current franchisee attempts to transfer within the terms of the statute but in violation of the franchisee's license agreement, this court will be in no better position later than now to decide the question of whether the Act's transfer and other provisions unconstitutionally impair plaintiffs' contract rights. *Cf. Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *Bob's Home Service, Inc. v. Warren County*, 755 F.2d 625, 628 (8th Cir.1985). The issues, therefore, are fit for judicial decision.

Furthermore, the uncertainty of which provisions to follow—the Act's or the license agreements'—constitutes hardship to the parties if this court withholds consideration of the constitutional issues under the Contract Clause. Plaintiffs (and for that matter their franchisees) should not be forced to act at their peril before a determination of these issues. This court concludes that the constitutional issues presented under the Contract Clause are ripe for adjudication.

### ELEVENTH AMENDMENT

■ Defendant Branstad in the Holiday Inns case and intervenor State of Iowa in the McDonald's case argue that "the Eleventh Amendment deprives this Court of jurisdic-

tion to issue declarative or injunctive relief against the state based on alleged violations of state law," citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment, however, is not implicated in these cases because neither McDonald's nor Holiday Inns seeks relief against Branstad or the state (and in McDonald's the state is merely an intervenor, not a defendant). Rather, plaintiffs seek a declaration that the Act, as applicable to plaintiffs' existing license agreements with the franchisee defendants, is unconstitutional under the federal and state Contract Clauses. The Eleventh Amendment does not deprive this court of jurisdiction.

### CONTRACT CLAUSE

The federal Contract Clause provides that "[n]o State shall * * * pass any * * * Law impairing the Obligation of Contracts * * *." U.S. Const. art. 1, § 10, cl. 1. The Iowa Contract Clause [5] uses language substantially similar to the federal clause, and the constitutional analysis is substantially the same, *see Adair Benev. Soc. v. State, Ins. Div.*, 489 N.W.2d 1, 5 (Iowa 1992).

### I. Substantial Impairment

The threshold inquiry under the Contract Clause is whether the Iowa Franchise Act "has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978); *see also Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983).

> The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract

---

**5.** "No * * * law impairing the obligation of contracts, shall ever be passed." Iowa Const. art. 1, § 21.

does not necessarily constitute a substantial impairment.

*Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704 (citations omitted). Under this inquiry, the court must "identify the precise contractual right that has been impaired and the nature of the statutory impairment." *Keystone Bituminous Coal Ass'n v. DeBenedictus,* 480 U.S. 470, 504, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987).

The undisputed facts in both cases' summary judgment records clearly establish that the parties executed the license agreements at issue with certain expectations, including that the agreements applied to only certain franchise locations and for certain terms (many for 20 years), restricted transfer rights, included certain provisions for early termination, did not promise renewal, and contained no territorial rights. For plaintiffs, these expectations played an integral role in the pricing of the licenses, and continue to be important in the successful operation of each franchise and in the operation of plaintiffs' respective franchising systems in general. Plaintiffs assert that the rights they retained in their license agreements operate as an incentive for franchisees to maximize their performance; allow plaintiffs to change with current market conditions; and serve the consuming public by maintaining adequate control over the quality of services provided under their licensed trademarks.

■ For these reasons, the court concludes that the Iowa Franchise Act materially changes the rights to which the parties agreed and for which they gave consideration. *Cf. Birkenwald Dist. Co. v. Heublein, Inc.,* 55 Wash.App. 1, 776 P.2d 721 (1989); *Jacobsen v. Anheuser–Busch, Inc.,* 392 N.W.2d 868, 874 (Minn.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 941, 93 L.Ed.2d 991 (1987); *Ward v. Chevron U.S.A. Inc.,* 123

Ariz. 208, 598 P.2d 1027 (Ct.App.1979); *Globe Liquor Co. v. Four Roses Distillers Co.,* 281 A.2d 19 (Del.), *cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971).

"In determining the extent of the impairment," the court must "consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704 (citations omitted). The court believes that the "industries" involved in these cases are the hotel [6] and food service industries. *See, e.g., Exxon Corp. v. Eagerton,* 462 U.S. 176, 194–95 n. 14, 103 S.Ct. 2296, 2307–08 n. 14, 76 L.Ed.2d 497 (1983) (oil industry); *Energy Reserves,* 459 U.S. at 413, 103 S.Ct. at 705 (natural gas industry); *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940) (building and loan association "enterprise"). State regulation of the hotel and food service industries prior to the Iowa Franchise Act focused mainly on the delivery of services to the customer, including safety and health concerns, *see, e.g.,* Iowa Code chs. 137B (food service), 137C (hotel), and discrimination against employees or customers, *see* Iowa Code §§ 216.6, 216.7 (formerly §§ 601A.6, 601A.7). The Act, which focuses on the business relationships between franchisors and franchisees, is much different from the type of regulation existing at the time the Act became effective.

Defendants and intervenors identify the relevant industry as the "franchise industry," and argue that plaintiffs reasonably could and should have expected that franchising in Iowa would be subject to additional regulation because of past regulation of certain franchise relationships in Iowa and in several other states. It is doubtful that franchising is an "industry" within the meaning of that word as used in *Energy Reserves* and other cases, or as defined generally.[7] The Court in

---

**6.** The court uses the phrase "hotel industry" in a more generic sense to include hotels, motels, inns, and other similar travel accommodations.

**7.** "Industry" is defined as "a department or branch of a craft, art, business, or manufacture" and "a group of productive or profit-making enterprises or organizations that have a similar technological structure of production and that

produce or supply technically substitutable goods, services, or sources of income." *Webster's Third New International Dictionary* 1155–56 (Merriam–Webster Inc. 1986). Franchising, on the other hand, is a means by which certain business relationships within an industry, and across industries, are formed and implemented.

*Allied Structural Steel,* however, when faced with a statute involving pension plan funding, considered whether the act "operate[d] in an *area* already subject to state regulation at the time the company's contractual obligations were originally undertaken," or whether it instead "invaded an *area* never before subject to regulation by the State." 438 U.S. at 250, 98 S.Ct. at 2725 (emphasis added). This court will therefore consider state regulation in the "area" of franchising at the time the agreements were executed.

Iowa's past regulation of franchising has been confined to franchises involving retailers of certain goods—motor vehicles, agricultural equipment, and motor fuel. *See* Iowa Agricultural Equipment Dealership Agreements Act, ch. 322F (1990); Iowa Farm Implement & Motorcycle Franchises Act, ch. 322D (1985); Iowa Purchasing Fuel from Alternate Sources Act, ch. 323A (1980); Iowa Travel Trailer Dealers, Manufacturers & Distributors Act, ch. 322C (1979); Iowa Marketing & Distribution of Motor Fuel & Special Fuel Act, ch. 323 (1974); Iowa Motor Vehicle Franchisers Act, ch. 322A (1970). In contrast, the Iowa Franchise Act extends to all franchises except those already regulated by state law and those relating to "the sale of construction equipment, lawn or garden equipment, or real estate." § 523H.1(3)(c).

Defendants also point to other states' general franchise statutes. *See, e.g.,* Illinois Franchise Disclosure Act of 1987, Ill.Ann. Stat. ch. 121½ ¶ 1701 *et seq.* (eff. 1/1/88); California Franchise Relations Act, Cal.Bus. & Prof.Code §§ 20000 *et seq.* (eff. 10/1/80; operative 1/1/81); Nebraska Franchise Practices Act, Neb.Rev.Stat. §§ 87–401 to 87–410 (1978); Arkansas Franchise Practices Act, §§ 4–72–201 *et seq.* (1977); Indiana Deceptive Franchise Practices, Ind.Code Ann. § 23–2–2.7–1 (1976; am. 1985, 1987); South Dakota Franchises for Brand–Name Goods & Services Act, S.D. Codified Laws Ann. §§ 37–5A–1 *et seq.* (1974); Michigan Franchise Investment Law, Mich.Comp.Laws Ann. § 445.1527 (1974; am. 1984); Wisconsin Fair Dealership Law, ch. 135 (1974); Minnesota Franchise Act, Minn.Stat.Ann. ch. 80C (1973); am. 1987); Virginia Retail Franchising Act, Va.Code Ann. §§ 13.1–557 *et seq.* (1972); Wisconsin Franchise Investment Law, Wis.Stat.Ann. ch. 553 (1972); Washington Franchise Investment Protection Act, Wash.Rev.Code Ann. §§ 19.100.180—19.100.190 (eff. 1972; am. 1973, 1980, 1991); New Jersey Franchise Practices Act, N.J.Stat. Ann. §§ 56:10–1 to 10–12 (1971). This court doubts that regulation in one state or even several states accurately forecasts what another state will regulate. Defendants assert that looking to regulation in other states is proper because the Court in *Energy Reserves* mentions by way of footnote that the natural gas industry is heavily regulated, citing regulation by a majority of states and the federal government. *See* 459 U.S. at 413 n. 15, 103 S.Ct. at 705 n. 15. In the discussion about prior regulation in the body of the opinion, however, the Court looks at the nature of natural gas regulation in Kansas specifically. *Id.* at 413–14, 103 S.Ct. at 705–06.

Even if this court did consider other states' legislation, it would not provide support to defendants: those statutes were not as comprehensive as the Iowa Act; most, if not all, were only prospective in nature (or have been applied as such); and most were enacted after the parties executed at least some of the McDonald's license agreements. Even at the time of execution of the Holiday Inns agreements in the 1980s and assignment of the McDonald's agreements in 1990 and 1991, only a minority of states had enacted general franchise regulation. Therefore, I conclude that prior regulation in Iowa and other states at the time of the execution and assignment of the license agreements was not sufficient to put plaintiffs on notice that they would be subject to later regulation of the type contained in the Act.

This court concludes that the retroactive application of Iowa Code §§ 523H.5(4), (5), (13)(d), (f), and (g); 523H.6; and 523H.8 to McDonald's license agreements, and §§ 523H.5(1), (4), (5), (13)(d), (e), and (f); 523H.6; 523H.7; and 523H.8 to Holiday Inns license agreements, substantially impairs the parties' contractual rights in the agreements in existence at the time the Act became effective.

## II. Public Purpose

■ If the Act constitutes a substantial impairment, the state of Iowa must then show a "significant and legitimate public purpose behind the regulation" to justify it, "such as the remedying of a broad and general social or economic problem." *Energy Reserves,* 459 U.S. at 411–12, 103 S.Ct. at 704. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id.* at 412, 103 S.Ct. at 705. The police power " 'is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' " *Allied Structural Steel,* 438 U.S. at 241, 98 S.Ct. at 2721 (quoting *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905)).

Senator Mike Gronstal, president of the Iowa Senate and a member of the Study Committee, filed an affidavit which states the following. The Iowa Legislature, through the Study Committee, undertook significant study of franchising to determine the areas in which legislation might be appropriate. The Committee found that some franchisors have engaged in abusive and unfair practices in relation to their franchisees.[8] The Committee heard testimony that franchising is an important part of Iowa's economy, that franchising as a way of business has been growing, and that the unfair practices of some franchisors can harm Iowa franchises, consumers, and other businesses. On this basis, the Study Committee recommended legislation in several areas. The bill went through

several drafts, with changes made after consultation with franchisors.

A review of the summary judgment record shows that the major purposes of the Act, as articulated by proponents during the hearings, were the equalization of bargaining power, the promotion of fair dealing, and the protection of franchisees from fraudulent and abusive practices by franchisors. Proponents also asserted that the government's role is to ensure a fair market and fair business practices between franchisees and franchisors. The Committee hearings in large part focused on specific instances of abuses in Iowa and nearby states by a few national franchisors.[9]

An important factor in the cases that have upheld the validity of legislation challenged under the Contract Clause is that the laws "did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of conduct designed to advance 'a broad societal interest' * * *." *Exxon,* 462 U.S. at 191, 103 S.Ct. at 2306 (citation omitted); *see also Ross v. City of Berkeley,* 655 F.Supp. 820, 832–33 (N.D.Cal.1987). The Court in *Exxon* distinguished the laws described above from those held invalid in *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and *Allied Structural Steel,* which " 'directly adjusted the rights and responsibilities of contracting parties.' " *Exxon,* 462 U.S. at 192, 103 S.Ct. at 2306; *Ross,* 655 F.Supp. at 833.

■ Here, the articulated overall purpose of the Act is specifically to adjust the balance of power between contracting parties. Although defendants and intervenors urge that

---

8. For instance, one Iowa franchisee spoke of the franchisor forcing him to sign, by threat and intimidation, a significantly different agreement several years before the end of his existing agreement. *See* Statement of Fred Miller. A Kansas franchisee spoke of an incident allegedly constituting "tortious interference with business relationships" by the franchisor, but his franchise agreement prohibited him from suing the franchisor. *See* Statement of Joel Grodberg.

The court notes that plaintiffs were not identified as those franchisors who have engaged in abusive practices.

9. The record indicates, however, that others who wanted to appear and present statements did not

out of fear of repercussions by their franchisors. *See, e.g.,* Committee Minutes, Nov. 1, 1991, p. 10 (comment of Co-Chair Hansen); Statement of Bob Schlutz.

Additionally, some franchisees spoke against the bill, fearing its effect on the good relationships they have with their franchisors and on the quality of the particular franchising systems in which they operate. Some speakers related the perceived burdens the regulation would place on large and small franchisors alike. A few speakers noted that the vast majority of franchisors operate in good faith.

franchising is a growing practice and a growing part of the economy in Iowa and throughout the nation, that fact by itself does not supply a broad societal interest justifying the substantial impairment of *existing* contracts. Nor have defendants and intervenors identified any other broad societal interest that the Act furthers. The state asserts that the unfair practices of some franchisors can harm consumers and other businesses, but it has not described the harm sufficiently for purposes of Contract Clause analysis.

This court finds and concludes that the Act is not based on a significant and legitimate public purpose such as a "broad and general social or economic problem" sufficient to justify the substantial impairment that some of its provisions have on plaintiffs' license agreements in existence on the Act's effective date.[10] Analysis under the last step in Contract Clause analysis is therefore unnecessary, and plaintiffs' motions for summary judgment will be granted.

### RULINGS AND ADJUDICATIONS

The motion for summary judgment by plaintiff McDonald's Corporation in Civ. No. 4–92–70301, filed on September 18, 1992, is GRANTED. The cross-motion for partial summary judgment by intervenor State of Iowa in Civ. No. 4–92–70301, filed on November 16, 1992, is DENIED.

The motion for partial summary judgment by plaintiffs Holiday Inns Franchising, Inc. and Holiday Inns, Inc. in Civ. No. 4–92–70431, filed on October 23, 1992, is GRANTED. The cross-motion for partial summary judgment by defendant Terry Branstad in Civ. No. 4–92–70431, filed on November 16, 1992, is DENIED.

IT IS ADJUDICATED that Iowa Code sections 523H.5(4), (5), (13)(d), (f), and (g); 523H.6; and 523H.8 substantially impair, in violation of the Contract Clauses of the United States Constitution and the Iowa Constitution, plaintiff McDonald's contractual rights under its license agreements with defendants Steven Nelson and Tass Enterpris-

es, Inc., described in the Background Facts section of this Memorandum Opinion.

IT IS FURTHER ADJUDICATED that Iowa Code sections 523H.5(1), (4), (5), (13)(d), (e), and (f); 523H.6; 523H.7; and 523H.8 substantially impair, in violation of the Contract Clauses of the United States Constitution and the Iowa Constitution, plaintiff Holiday Inns' contractual rights under its license agreements with defendants John Q. Hammons and Omaha Hotel, Inc., described in the Background Facts section of this Memorandum Opinion.

### § 1292(b) CERTIFICATION

Pursuant to 28 U.S.C. § 1292(b), I certify that I am of the opinion that the foregoing adjudications involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the adjudications may materially advance the ultimate termination of the litigation.

---

10. This court, of course, expresses no opinion on the constitutionality of the Act as applied to contracts entered into or renewed *after* the effective date of the Act.