**EQUIPMENT MANUFACTURERS INSTITUTE, Agco Corporation, Case Corporation, Deere & Company, and New Holland North America, Inc., Plaintiffs,**

v.

**William J. JANKLOW, Governor of the State of South Dakota, in his Official Capacity, and Mark Barnett, Attorney General of the State of South Dakota, in his Official Capacity, Defendants,**

and

**Farm Equipment Association of Minnesota and South Dakota, Intervenor–Defendant.**

**No. CIV 99–4161.**

United States District Court,
D. South Dakota,
Southern Division.

March 30, 2001.

David A. Gerdes, Michael F. Shaw, May, Adam, Gerdes & Thompson, Pierre, SD, David M. Kroeger, Margaret J. Simpson, Jenner & Block, Chicago, IL, for Plaintiffs.

Jeffrey P. Hallem, Attorney General's Office, Pierre, SD, for Defendants William J. Janklow Mark W. Barnett.

John E. Burke, Sioux Falls, SD, Michael P. Healy, Kansas City, MO, for Amicus Diesel Machinery, Inc.

J. Michael Dady, W. Michael Garner, Cheryl A. Stanton, Dady & Garner, Minneapolis, MN, for Intervenor Defendant Farm Equipment Association of Minnesota and South Dakota.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

This declaratory judgment action concerns the constitutionality of a South Dakota law governing contracts between farm machinery manufacturers and their in-state dealers. The parties have filed cross-motions for summary judgment. For the reasons stated below, each motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiffs represent the interests of various farm machinery manufacturers.

Plaintiff Equipment Manufacturers Institute (EMI) is a Chicago-based trade association representing 141 companies which manufacture equipment, including agricultural equipment. Plaintiffs AGCO, Case Corporation (Case), Deere & Company (Deere) and New Holland North America, Inc. (New Holland) are all members of EMI, and all manufacture farm machinery. Another member of EMI, Gehl Corporation (Gehl), also manufactures farm machinery.[1] AGCO, Case, Deere, New Holland, and Gehl each uses a system of independent dealers to distribute and sell its farm equipment. The originally-named defendants are the Governor and Attorney General of the State of South Dakota. Since the commencement of the lawsuit, the Farm Association of Minnesota and South Dakota, an organization which represents the interests of South Dakota farm machinery dealers, has intervened as a defendant.

South Dakota law has long governed the relationships between farm machinery manufacturers and farm machinery dealers. Since 1951, it has been unlawful in the State of South Dakota for a manufacturer "to coerce or attempt to coerce" a dealer in "farm tractors" or "farm implements" to purchase or accept delivery of motor vehicles, parts or other commodities which the dealer has not ordered. SDCL 37–5–1, 1951 S.D. Laws Ch. 262, § 1. Since the same date, it has been unlawful for a manufacturer "to coerce or attempt to coerce" such a dealer "to enter into any agreement" with the manufacturer, "to assign, sell, or dispose of any contract or property in any way," "to expend any money," or "to do any other act unfair to such

dealer." SDCL 37–5–2, 1951 S.D. Laws Ch. 262, § 1. State law has also forbidden manufacturers from accomplishing the same results by threatening to terminate a dealer's franchise or agency agreement, or "by any other unfair means or by duress of any kind." SDCL 37–5–1, 37–5–2. Similarly, it has been unlawful for a manufacturer to cancel the franchise of a dealer "without due regard for the equities of the dealer and without just provocation." SDCL 37–5–3, 1951 S.D. Laws Ch. 262, § 1.

In 1999, the South Dakota State Legislature passed, and the Governor signed, additional legislation on dealership agreements (the Dealership Act). The Dealership Act, which is the subject of this action, also limits the ability of manufacturers to terminate or discontinue their contractual relationships with dealers. It provides:

> The following circumstances are not cause for the termination or discontinuance of a dealership contract, nor for entering into a dealership contract for the establishment of an additional dealership in a community for the same line-make:
>
> (1) The change of executive management or ownership of the dealer, unless the manufacturer can show that the change would be detrimental to the representation or reputation of the manufacturer's product;
>
> (2) Refusal by the dealer to purchase or accept delivery of any machinery, parts, accessories, or any other commodity or service not ordered by the dealer, unless such machinery, parts, accessories, or other commodity or service is necessary for the operation

---

**1.** Gehl is not a party to this action, but its dealership agreements are relevant because it manufactures farm equipment and is a member of Plaintiff EMI. Another member of EMI, Komatsu America International Company (Komatsu) has submitted an affidavit in support of Plaintiffs' Motion for Summary Judgment, which the Court has considered as general evidence of the interests of EMI member companies.

of machinery commonly sold in the dealer's area of responsibility;

(3) The sole fact that the manufacturer desires further penetration of the market;

(4) The fact that the dealer owns, has an investment in, participates in the management of, or holds a dealership contract for the sale of another line-make of machinery, or that the dealer has established another line-make of machinery in the same dealership facilities as those of the manufacturer, if the dealer maintains a reasonable line of credit for each line-make of machinery; or

(5) Refusal by the dealer to participate in any national advertising campaign or contest or purchase any promotional materials, display devices, or display decoration or materials which are at the expense of the dealer.

SDCL 37–5–14, 1999 S.D. Laws Ch. 200. The Dealership Act became effective on July 1, 1999.

The dealership contracts used by the plaintiff manufacturers govern several types of conduct now regulated by the Dealership Act:

(1) All of the dealership contracts submitted to the Court give the manufacturer the option to terminate the contract in the event of a change of ownership or management of the dealer.

(2) The dealership contracts generally require dealers to stock replacement parts and other inventory in proportion to "sales possibilities" or "anticipated demand" for the dealer's area.

(3) The dealership contracts all require the dealer to achieve a certain, unspecified, level of market penetration, usually to the satisfaction of the manufacturer. The dealership contracts also allow manufacturers either to enlarge or reduce the dealer's market area, or to establish additional dealers in the dealer's area.

(4) Two of the dealership contracts—those of AGCO and Deere—give manufacturers the right to control the dealer's display and stocking of competing products. In some instances, a Deere dealer must make "such separation of the personnel, facilities, capital and other resources devoted to the [other product line] as is satisfactory" to Deere.

(5) The dealership contracts used by AGCO and New Holland require dealers to conduct advertising and promotional campaigns with the manufacturer's programs or materials.

Plaintiffs claim that these provisions lie at the heart of the relationships between manufacturers and dealers.

In addition to the provisions listed above, the Dealership Act also prohibits certain types of clauses in dealership contracts. Under section 3 of the Dealership Act,

No manufacturer may require a dealer to agree to the inclusion of a term or condition in a dealership contract, or in any lease or agreement ancillary or collateral to a dealership contract, as a condition to the offer, grant, or renewal of such dealership contract, lease, or agreement, that:

\* \* \* \* \* \*

(2) Requires that disputes between the manufacturer and dealer be submitted to arbitration or to any other binding alternate dispute resolution procedure. However, any dealership contract, lease or agreement may authorize the submission of a dispute to arbitration or to binding alternate dispute resolution if the manufacturer and dealer voluntarily agree to submit the dispute to arbitration or binding alternate dispute resolution at the time the dispute arises; or

(3) Requires a dealer to pay the attorney fees of a manufacturer.

SDCL 37–5–15(2). At least one of the dealership contracts submitted to the Court contains such provisions.

In their Complaint, Plaintiffs seek a declaration that the Dealership Act and its specific provisions are void. Plaintiffs argue that the law: (1) violates the Contract Clauses of the United States Constitution and the South Dakota Constitution; (2) is pre-empted by the Federal Arbitration Act, 9 U.S.C. § 2; (3) is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article VI, § 2 of the South Dakota Constitution; and (4) violates the requirement of substantive due process contained in the Fourteenth Amendment to the United States Constitution and Article VI, § 2 of the South Dakota Constitution. Defendants argue that all of the provisions of the Dealership Act are valid and enforceable.

## DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Robinson v. Valmont Industries,* 238 F.3d 1045, 1047 (8th Cir. 2001). For any issue on which the moving party will have the burden of proof at trial, that party "bears the burden of proof in addition to the burden of demonstrating that no genuine issues of material fact exist." *Exxon Corp. v. Phillips Petroleum,* 81 F.Supp.2d 746, 750 (S.D.Tex.1999).

### A. Contract Clause

Although the federal Contract Clause provides, in rather draconian terms, that "[n]o State shall … pass any … Law

impairing the Obligation of Contracts," U.S. Const. art. I, § 10, it has long been interpreted to give States some flexibility to regulate existing contracts. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 240, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978). The South Dakota Constitution contains substantially the same provision as the Constitution of the United States. *See* S.D. Const. art. VI, § 12; *Engelcke v. Farmers' State Bank,* 61 S.D. 92, 246 N.W. 288, 290 (1932). Plaintiffs' challenge under the Contract Clause concerns only contracts which were in existence prior to the effective date of the Dealership Act.

■ Determining whether a Contract Clause violation exists involves three questions: (1) whether the statute substantially impairs an existing contractual relationship; (2) whether the state has a significant and legitimate public purpose behind the regulation; and (3) whether the statute adjusting contractual rights is appropriately tailored to the conditions and public interest it was enacted to address. *Educational Employees Credit Union v. Mutual Guaranty Corp.,* 50 F.3d 1432, 1438 (8th Cir.1995). If the statute does not substantially impair a contractual relationship, there is no need to answer the second two questions. *Id.*

Plaintiffs argue that the Dealership Act substantially impairs manufacturers' existing contractual rights. In support of their argument, Plaintiffs identify three areas in which the new law reduces the flexibility which their dealership contracts were written to provide: (1) the ability of manufacturers "to choose who will represent them and with whom they will work in the context of a long-term dealer relationship"; (2) the ability of manufacturers "to ensure that dealers fulfill their obligations effectively to promote and sell" manufacturers' products;[2] and (3) the principle that deal-

---

**2.** For example, Plaintiffs argue that the limi-

tations involving inventory would permit deal-

er territory is non-exclusive. In addition, Plaintiffs note that the Dealership Act restricts their ability to require dealers to participate in national advertising campaigns or to purchase promotional materials.

In determining whether the Dealership Act constitutes a substantial impairment of existing contractual obligations, its restrictions must be compared to the body of pre-existing regulations. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) (opinion of Holmes, J.). Thus, in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Supreme Court refused to invalidate new state regulations on natural gas contracts, where the contracts were structured against the background of state regulation which was "foreseeable as the type of law that would alter contractual obligations." *Energy Reserves Group,* 459 U.S. at 416, 103 S.Ct. at 707. "The idea . . . is that if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed." *Holiday Inns Franchising, Inc. v. Branstad,* 29 F.3d 383, 385 (8th Cir.1994).

A good example of this principle is the Seventh Circuit's decision in *Chrysler Corp. v. Kolosso Auto Sales, Inc.,* 148 F.3d 892 (7th Cir.1998). *Kolosso* involved a 1988 dealership contract between Chrysler and an Appleton, Wisconsin automobile dealer that forbade the dealer from changing the location of his dealership without permission from Chrysler. *Kolosso,* 148 F.3d at 893. In 1993, the Wisconsin Motor Vehicle Dealers Law was amended to enti-

tle a dealer to challenge a manufacturer's refusal to allow him to move his dealership in a state administrative agency, and to protect a dealer's decision to move if it was based upon "good cause." *Id.* The amendment provided several substantive criteria for making a good cause determination, including potential adverse effects upon the dealer, the manufacturer, and other motor vehicle dealers. *Id.*

Ruling upon Chrysler's challenge under the Contract Clause, Chief Judge Posner read the amendment against the background of prior regulation. *See Kolosso,* 148 F.3d at 895. At the time the parties entered into the dealership contract, the Motor Vehicle Dealers Law already prohibited the termination of a dealer "unfairly, without due regard to the equities or without just provocation," a phrase which had been interpreted in Wisconsin to forbid termination without good cause. *Id.* (citing Wisconsin state cases). According to Chief Judge Posner, "[t]he 1993 amendment in effect regularized a gray area in the dealership law by creating a specific procedure for resolving disputes over dealers' requests to relocate." *Id.* at 896. Although the amendment was "a real change," it was "largely procedural" and "the sort of fine tuning of the statute that Chrysler would have expected to take place from time to time because the statute regulates in such detail a complex commercial relationship." *Id.* Because Chrysler should have known that it was "operating in a grey area of the dealership law [and] that the law might some day be amended to regulate disputes over relocation specifically," there was no substantial impairment of Chrysler's contract with the dealer, and no Contract Clause violation. *Id.* at 897.

ers to "cherry-pick" products from a competing manufacturer, or even "lock up" the

agreement of a manufacturer to avoid competing with it.

Sometimes a new law does upset the reasonable expectations of contracting parties. In *McDonald's Corp. v. Nelson*, 822 F.Supp. 597 (S.D.Iowa 1993), the case the Eighth Circuit affirmed as *Holiday Inns, supra*, the district court sustained a Contract Clause challenge to certain portions of the Iowa Franchise Act, as applied to the hotel and food service industries. *McDonald's*, 822 F.Supp. at 605–09. In determining whether the Act imposed a substantial impairment on existing contract rights, the court first noted that Iowa's "regulation of the hotel and food service industries prior to the Iowa Franchise Act focused mainly on the delivery of services to the customer, including safety and health concerns." *Id.* at 606. The court then found that the new law, which focused "on business relationships between franchisors and franchisees," was "much different from the type of regulation existing at the time the Act became effective." *Id.* Based upon these differences, the court concluded that the pre-existing Iowa law "was not sufficient to put plaintiffs on notice that they would be subject to later regulation of the type contained in the Act." *Id.* at 607.

South Dakota's prior regulation of machinery dealerships has been far more extensive than the prior regulation at issue in *McDonald's*. As the *McDonald's* court noted, Iowa law did not regulate business relations between franchisors and franchisees at the time the Iowa Franchise Act was passed. *Id.* at 606. In contrast, when the Dealership Act became law, South Dakota law had been regulating machinery manufacturer-dealer relationships for almost 50 years. *See* SDCL 37–5–1–37–5–12 (ranging in date of enactment from 1951 to 1991). This prior regulation put equipment manufacturers on notice that their dealership contracts would be subject to at least some state regulation on the same topic.

It also put manufacturers on notice that South Dakota might regulate their ability to terminate dealers. Before the Dealership Act became law, it was unlawful for a manufacturer "unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer in ... farm tractors [ ] or farm implements." SDCL 37–5–3. Plaintiffs argue that the Dealership Act imposes new burdens, by preventing them from choosing dealers who, in their view, will maximize profits and best represent their products. The old "just provocation" test, however, did just that. As interpreted by the South Dakota Supreme Court, the "just provocation" test has meant "some sort of misconduct or shortcoming on the part of the dealer," and not mere "good faith" economic considerations on the part of the manufacturer. *See Groseth International, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 168 (S.D.1987).

The Dealership Act's restrictions on termination are simply particular applications of the general standard in § 37–5–3. The new Act does not absolutely prohibit termination; rather, it allows termination in specified circumstances that do not violate "the equities of the dealer" and which constitute "just provocation." For example, the Act allows a manufacturer to terminate a dealer or establish a new dealership based on a change in ownership or management of the dealer, as long as it "can show that the change would be detrimental to the representation or reputation of the manufacturer's product." SDCL 37–5–14(1). It also allows termination if a dealer refuses to purchase or accept delivery of parts or machinery which are "necessary for the operation of machinery commonly sold in the dealer's area of responsibility," SDCL 37–5–14(2), or if the dealer fails to maintain "a reasonable line of credit for each line-make of machinery" it of-

fers, SDCL 37–5–14(4).[3] Similarly, the Act allows a manufacturer to consider market penetration in deciding whether to terminate a dealership contract, as long as other valid considerations support the termination. SDCL 37–5–14(3).[4]

█ Such regulations, when read against South Dakota's prior regulation of farm machinery dealership contracts, are the kind of "fine tuning" sanctioned in *Kolosso.* Defendants point out that the principal change affected by the Wisconsin law at issue in *Kolosso* was the creation of an administrative review process, and argue that *Kolosso* does not support the enactment of substantive changes to an existing law. As the Seventh Circuit stated, however, the statute in *Kolosso* was only "*largely* procedural." *Id.* at 896 (emphasis added). It did add substantively to the prior law, by specifically providing that the good cause standard applied to moving an automobile dealership, and by establishing a list of factors to guide a determination of good cause. *Id.* at 893. Generally speaking, the substantive changes effected by the Dealership Act at issue in this case are not so different from the changes in *Kolosso* as to impose a substantial impairment under the Contract Clause.

The Dealership Act does impose a substantial impairment in one respect. While the "just provocation" standard covers a wide range of manufacturer conduct, the old law imposed restrictions only on the termination of an existing dealership. The new law goes farther, by also restricting manufacturers' rights to establish new dealerships. These restrictions constitute a substantial impairment of manufacturers' existing contracts, which guarantee the right to adjust dealer territory and to establish new dealerships in that territory.

To the extent that the Dealership Act impairs existing dealership contracts, it must serve a significant and legitimate public interest. To meet this requirement, a law must not "impose a rule limited in effect to contractual obligations or remedies." *Exxon Corp. v. Eagerton,* 462 U.S. 176, 191, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983). It must instead impose "a generally applicable rule of conduct designed to advance 'a broad societal interest.'" *Id.* (quoting *Allied Structural Steel,* 438 U.S. at 249, 98 S.Ct. at 2724). The law must also be "based on reasonable conditions which justified the adoption of the legislation" and "of a character appropriate to the public purpose." *Educational Employees Credit Union,* 50 F.3d at 1438 (citation and internal quotation marks omitted).

█ This "public purpose" standard is usually phrased as a variant of rational-basis review, testing whether the law is a reasonable means to a legitimate public purpose. *See U.S. Trust Co. v. New Jersey,* 431 U.S. 1, 22–23, 97 S.Ct. 1505, 1517–18, 52 L.Ed.2d 92 (1977). Review under the Contract Clause, however, is in one way critically different. Under traditional rational-basis review, the party challenging the law bears the burden of showing that the law is irrational. In contrast, "if a

---

3. These provisions do not specifically forbid the termination of a dealer who "cherry picks" items from one product line to the exclusion those in another, or a dealer who "locks up" the agreement of a manufacturer to avoid competition. The latitude which these provisions give manufacturers makes it unlikely that dealers could "cherry pick" products or "lock up" product lines with impunity.

4. Some of the provisions in § 37–5–14 are also related to other previously existing state regulations preventing manufacturers from using "unfair conduct" such as the threat of termination to pressure dealers into purchasing products which they did not order, participating in national advertising campaigns, or purchasing promotional materials. *See* SDCL 37–5–1, 37–5–2.

State undertakes to alter substantially the terms of a contract, it must justify the alteration, and the burden that is on the State varies directly with the substantiality of the alteration." *White Motor Corp. v. Malone*, 599 F.2d 283, 287 (8th Cir.1979).

Defendants have not justified the Dealership Act's restrictions on the establishment of new farm machinery dealerships. To satisfy the Contract Clause, the defenders of the Dealership Act must specifically describe the harm sought to be avoided. *See McDonald's*, 822 F.Supp. at 609. As justification for the alteration of existing contracts, Defendants claim that the Dealership Act protects not only machinery distributors, but also farmers and the local rural economies which depend upon them. The achievement of that goal is a legitimate public interest. *See Farmers Union Oil Co. v. Allied Products Corp.*, 162 B.R. 834, 840–41 (D.N.D.1993). Defendants, however, have failed to produce evidence that the establishment of new dealerships for the reasons prohibited in the Act would harm local rural areas. In the absence of such evidence, the Act's restrictions on establishing additional dealerships, contained in § 37–5–14, are void as they apply to contracts which were in existence before the effective date of the Act.

### B. *Federal Arbitration Act*

Section 2 of the Federal Arbitration Act provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the Supremacy Clause, U.S. Const. art. VI, this federal statute invalidates any state policy which puts arbitration agreements on an "unequal footing" with basic contractual terms such as price, service and credit. *Doctor's Associates, Inc. v.*

*Casarotto*, 517 U.S. 681, 685–86, 116 S.Ct. 1652, 1655, 134 L.Ed.2d 902 (1996).

 The Dealership Act's arbitration provision is just such a policy. Section 3 of the Dealership Act prevents a manufacturer from conditioning the offer, grant, or renewal of a dealership contract on a dealer's agreement to the inclusion of a binding arbitration clause. SDCL 37–5–15(2). The Dealership Act does not prevent the parties from including such an arbitration clause, as long as the manufacturer does not insist upon it as a condition to the offer, grant, or renewal of the dealership contract. And as Defendants point out, the Dealership Act permits the arbitration of disputes, as long as the arbitration is voluntarily agreed to by both parties at the time the dispute arises. *Id.* Despite these qualifications, however, the Act still places arbitration clauses on an unequal footing, by refusing to enforce them along with other terms to which the parties mutually agree *before* a dispute arises. Under the Supremacy Clause of the United States Constitution and the Federal Arbitration Act, section 3 of the Dealership Act, SDCL 37–5–15(2), is unlawful.

### C. *Vagueness*

 The void-for-vagueness doctrine, as applied to state law, is embodied in the Due Process Clause of Fourteenth Amendment. *See Woodis v. Westark Community College*, 160 F.3d 435, 438 (8th Cir.1998). A vague regulation violates the Constitution because it (1) fails to provide the "fair warning" necessary to "give the ordinary person of reasonable intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; and (2) "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Village of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (citation omitted). The Constitution tolerates more vagueness in economic regulations which primarily govern businesses, and in regulations which impose civil rather than criminal penalties. *Id.*

Vagueness challenges "that do not involve the First Amendment must be examined in light of the specific facts of the case at hand, and not with regard to the statute's facial validity." *Woodis*, 160 F.3d at 438–39. Plaintiffs object to the statutory definition of "community" in section 2 of the Dealership Act, arguing that the term is "hardly intuitive," and does not provide sufficient direction as to where a manufacturer is prohibited from establishing an additional dealership. *See* SDCL 37–5–14. Plaintiffs, however, do not have any specific facts against which to test their argument. Under *Woodis*, their facial challenge to the term "community" must be rejected at this time.

 Even if Plaintiffs were challenging the Dealership Act as applied to a particular case, it seems doubtful that they could show that its use of the term "community" is unconstitutionally vague. To prevail on a vagueness claim which does not concern constitutionally protected conduct such as free speech, a plaintiff must demonstrate that the challenged law "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. at 1193. Although there are several possible sources from which courts could draw in defining "community," the most natural candidate seems to be "the dealer's area of responsibility," a phrase which is used in the Act itself. *See* SDCL 57–5–14(2). In any event, it seems unlikely that a court would have a difficult time applying the term "community" in a case involving two dealerships in the same small farm town. Under *Hoffman Estates*, a court's ability to make such an interpretation means that a statute is not void for vagueness.

### D. *Substantive Due Process*

Plaintiffs also argue that the Dealership Act violates their constitutional rights to substantive due process. Under the Due Process Clause of the United States Constitution, the standard for such a showing is whether the Act is "arbitrary, capricious and not rationally related to a legitimate public purpose." *WMX Technologies, Inc. v. Gasconade County*, 105 F.3d 1195, 1198 (8th Cir.1997) (citation omitted). Imposing a "more stringent" test, the South Dakota Constitution requires that a statute must "bear a real and substantial relation to the objects sought to be obtained." *Knowles v. United States*, 544 N.W.2d 183, 189 (S.D.1996). Unlike their challenge under the Contract Clause, which applies only to existing contracts, Plaintiffs' due process challenge also questions the constitutionality of the Act as it applies to future contracts.

In a rural state like South Dakota, legislation affecting farm equipment dealerships has ramifications beyond the special interests of farm machinery dealers. The North Dakota Supreme Court has recognized that its state "has a significant and legitimate interest in providing protection to distributors of vehicles and farm implements because a distributor service is a substantial public need in [its] economic system." *Hall GMC, Inc. v. Crane Carrier Co.*, 332 N.W.2d 54, 61 (N.D.1983). Common sense suggests that the State of South Dakota has a similar public interest in protecting machinery dealerships.

This common-sense judgment is confirmed by the evidence before the Court. An affidavit submitted by the South Dakota Secretary of Agriculture states that the economy of South Dakota, like the economy of North Dakota, is heavily dependent on agriculture, and that agriculture, in

turn, is dependent on the availability of modern technology, including farm equipment. The evidence also emphasizes the importance of local distribution systems to the farmers who support South Dakota's agriculture industry:

> Due to the rural nature of the state, closure of a farm equipment dealership increases the number of miles that farmers will have to travel for equipment and repairs. At the present time, trips to obtain parts are often more than thirty miles. Additional distance is a hardship, not a mere inconvenience. The increase in "down time" is a cost to farmers and ranchers that would have a corresponding effect on their profitability. Ultimately the viability of small and mid-sized farms and ranches [is] affected.

This evidence, which Plaintiffs do not dispute, supports the conclusion that South Dakota has a significant and legitimate public interest in protecting farm machinery dealers.

The Dealership Act also bears a real and substantial relation to the protection of these communities. Plaintiffs argue that the Dealership Act will actually hurt farmers and farm communities, by allowing dealers to reduce the amount of products, parts, and services they have to offer, and by preventing manufacturers from establishing additional dealers who are willing to provide a wider range of products in the same community. The Dealership Act, however, addresses this potential problem by allowing a manufacturer to terminate a dealer or to establish a new dealership if the current dealer refuses to accept delivery of products and services which are "necessary for the operation of machinery commonly sold in the dealer's area of responsibility," SDCL 37–5–14(2), or if a

dealer fails to maintain reasonable lines of credit for the different product lines it offers, SDCL 37–5–14(4).

■ The Dealership Act's restrictions on establishing new dealerships, which are void under the Contract Clause, must survive Plaintiffs' challenge under substantive due process. In contrast to rational-basis review under the Contract Clause, the Dealership Act must be presumed to satisfy the requirements of substantive due process unless Plaintiffs prove otherwise. *See Polenz v. Parrott,* 883 F.2d 551, 558 (7th Cir.1989); *Katz v. Board of Medical & Osteopathic Examiners,* 432 N.W.2d 274, 279 (S.D.1988). It is possible that without the Act's restrictions on the establishment of additional dealerships, manufacturers might be able to get around the Act's anti-termination provision, by simply establishing and subsidizing additional dealerships to run existing dealers out of business. Plaintiffs have not offered any evidence or argument suggesting that it would have been irrational for the South Dakota Legislature to reach such a conclusion.

■ Plaintiffs have also failed to show that the Act's bar on clauses shifting attorney fees from a manufacturer to a dealer violates substantive due process. The attorney-fee provision of the Dealership Act does to some extent resemble special-interest legislation, because it protects dealers, but not manufacturers, from such clauses. It is possible, however, that the legislature concluded that manufacturers did not need such protection, and that the bar on shifting attorney fees to farm machinery dealers, like the other provisions in the Act, would protect rural communities by protecting the dealers.[5]

---

**5.** Plaintiffs do not specifically argue that the anti-fee-shifting provision is special interest legislation. Instead, they argue that it is irrational to protect a party who loses in litigation

from paying the winner's attorney fees. This argument contradicts the long-standing American rule, which "but for a few well-recognized exceptions ... has always been that

Because Plaintiffs' facial challenge charges that any application of the Act is unconstitutional, *see WMX Technologies,* 105 F.3d at 1198, this denial of their claim does not prevent a future decision that the Act violates substantive due process as applied to particular facts.

## CONCLUSION

The Dealership Act does not violate the Contract Clauses of the United States or South Dakota Constitutions, except to the extent that it impairs the contractual rights of manufacturers to establish additional dealerships in the same communities as existing dealers, as those rights existed prior to July 1, 1999. The Act's restriction on binding arbitration agreements violates the Supremacy Clause of the United States Constitution, because it conflicts with the Federal Arbitration Act. The Act is not unconstitutionally vague, and does not, on its face, violate substantive due process. Accordingly,

IT IS ORDERED:

(1) that summary judgment is granted in favor of Plaintiffs and denied as to Defendants on Count I of the Complaint, to the extent that the Dealership Act impairs the contractual rights of manufacturers to establish additional dealerships in the same communities as existing dealers, as those rights existed prior to July 1, 1999, and on all of Count II; and

(2) that summary judgment is granted in favor of Defendants and denied as to Plaintiffs on the rest of Count I, and on all of Counts III and IV.

absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415

## DECLARATORY JUDGMENT

In accordance with the Memorandum Opinion and Order filed on this date with the Clerk,

IT IS ORDERED, ADJUDGED, and DECREED that Section 37–5–14 of the South Dakota Codified Laws, 1999 S.D. Laws Ch. 200, § 2, violates the Contract Clauses of the United States Constitution and the Constitution of the State of South Dakota, to the extent that it impairs the contractual rights of farm machinery manufacturers to establish additional dealerships in the same communities as their existing dealerships, as those rights existed prior to July 1, 1999.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Section 37–5–15(2) of the South Dakota Codified Laws, 1999 S.D. Laws Ch. 200, § 3(2), is preempted and invalid under the Supremacy Clause of Article VI of the United States Constitution and Section 2 of the Federal Arbitration Act, 9 U.S.C. § 2.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that each party shall bear its own costs.

(1976); *see also Jacobson v. Gulbransen,* 623 N.W.2d 84 (S.D.2001) (affirming American rule on attorney fees).